**MARSHALL–WELLS CO. v. HAWLEY et al.**

No. 223.

District Court, D. Minnesota,
Fifth Division.

Aug. 4, 1942.

Thomas M. McCabe (of McCabe, Gruber & Clure), of Duluth, Minn., for plaintiff.

Samuel Lipschultz (of Lipschultz & Lipschultz) of St. Paul, Minn., for defendants.

NORDBYE, District Judge.

Plaintiff seeks to obtain a declaratory judgment declaring and determining that its two employees, Clyde Hawley and Walter Roginski, are bona fide executives within the meaning of Section 13(a) (1) of the Fair Labor Standards Act of 1938, 29 U.S.C.A. § 213(a) (1), and within the meaning of Section 541.1 of the Regulations issued by the Administrator. Certain union officials are made parties hereto by reason of the fact that such union is the authorized collective bargaining agent for all of the employees in the departments where the defendants Hawley and Roginski are employed, and such union has made certain demands with respect to the claimed back-pay of these two employees arising out of plaintiff's alleged failure to comply with the Fair Labor Standards Act.

Plaintiff concedes that these employees are engaged in interstate commerce within the meaning of the Act, and it has been shown that an actual controversy exists between the parties. Plaintiff apparently is desirous of obtaining a declaration of its legal rights as to the controversy which exists, and requests this court to assess reasonable attorneys' fees against it regardless of the outcome of the controversy so that the defendant employees may defend the suit without costs or expenses to them.

The question as to the status of defendants Hawley and Roginski as executives has been reduced to three issues: Section 541.1 of the Regulations defining the term "executive" lists six classifications. They are:

"The term 'employee employed in a bona fide executive * * * capacity' in section 13(a) (1) of the act shall mean any employee—

"(A) whose primary duty consists of the management of the establishment in which he is employed or of a customarily recognized department or subdivision thereof, and

"(B) who customarily and regularly directs the work of other employees therein, and

"(C) who has the authority to hire or fire other employees or whose suggestions and recommendations as to the hiring or firing and as to the advancement and promotion or any other change of status of other employees will be given particular weight, and

"(D) who customarily and regularly exercises discretionary powers, and

"(E) who is compensated for his services on a salary basis at not less than $30 per week (exclusive of board, lodging, or other facilities), and

"(F) whose hours of work of the same nature as that performed by nonexempt employees do not exceed 20 percent of the number of hours worked in the workweek by the nonexempt employees under his direction; provided that this subsection (F) shall not apply in the case of an employee who is in sole charge of an independent establishment or a physically separated branch establishment."

It is conceded that these employees meet the test of three of the classifications. Subsections (A), (C) and (D) are herein in dispute, and the latter two will be first considered. With respect to Subsection (C), plaintiff contends only that defendants Hawley and Roginski occupy such a status that their suggestions and recommendations as to hiring or firing and as to the advancement and promotion, or any other change of status of other employees, would be given particular weight, and does not contend that either has the right to hire or fire.

The plaintiff company handles wholesale hardware and kindred articles. The Duluth branch serves Northern Michigan, Wisconsin, Minnesota, Northern Iowa, North and South Dakota, and the Northern part of Montana. The defendant Hawley is in charge of the shipping office, where he has been employed for some twenty years, and receives a salary of $166.30 per month. He has under his supervision some four employees who perform their duties under his direction, and in connection with the business of plaintiff's wholesale house, orders are received for merchandise, and thereafter, in the ordinary course of business, such orders are filled and the merchandise becomes ready for shipment. The shipping office under Mr. Hawley's supervision receives the packing slip and the so-called floor sheets, and as these records come to the shipping office, they are first called to

Mr. Hawley's attention. His long experience in that department enables him through memory to determine at a glance whether the name and address of the customer is correctly indicated on the packing slip, and also whether or not the particular routing indicated is proper. However, at frequent intervals, he must determine whether the shipment should go by freight, parcel post, or express. There may be no indication from the customer as to how the shipment should be made, and in cases where the shipment is under the minimum weight requirement for freight or truck delivery, he then notes that the shipment should be by parcel post or express, whichever method is the most feasible and the most economical. In some cases, he calls drays in making local deliveries, and it is within his discretion to determine which dray line should be called. Under these circumstances, he is required to keep a record of the different expenses incurred for local drayage. In general, it may be stated that his duty is to prepare the bills of lading and to send the merchandise the cheapest and the most expeditious way under the circumstances. An economical routing and the dispatch with which the merchandise reaches the customer is a matter of importance to the customer, and efficiency in this regard undoubtedly redounds to the goodwill and reputation of plaintiff's wholesale business.

After Mr. Hawley has concluded his checking and determined the route and method of shipment, the packing lists with such notations as are found to be necessary are delivered to the typist who prepares the bills of lading. He inspects the bills of lading after they have been prepared by the typist, and if any error has been made in the typing or if the work is not performed in a neat and presentable manner, it would be his duty to send it back for correction. When any question arises in connection with the preparation of a bill of lading or other clerical work, he determines what shall be done and directs the typists accordingly. It may be pointed out that Mr. Hawley has been in this department for some twenty years, and the experience that he has obtained during this period, together with his expert knowledge with respect to the problems of routing shipments, etc., has resulted in a smooth-running and efficient department, and undoubtedly in most instances the experienced typists know how to perform their work without any additional direction from him.

The employees in the shipping room are all hired by the personnel department. When new employees are selected, they are placed on probation for three months before they are placed on the permanent pay-roll. Their qualifications are discussed with Hawley by the hiring officer. Hawley then gives his opinion as to the progress that the new employee has made and informs his superior whether the employee is satisfactory or otherwise. The evidence of the plaintiff in the case is that particular weight is attached to Hawley's recommendation in this regard. In so far as actual instances are concerned, it does appear that, whenever new help is put on in the shipping room, Hawley's opinion is required as to the advisability of their being retained on permanent employment. There have, however, been no instances where a new employee was not satisfactory. Furthermore, it does not appear that Hawley has ever taken the initiative in obtaining the hiring or firing of any employees. At one time he complained to a Mr. Mehne, the superintendent of the warehouse, as to the work of one of the girls in the shipping room. The testimony indicates that Mr. Mehne gave the girl a "talking to" and her work thereafter improved. When extra help is needed and when help is to be laid off, Hawley makes recommendations to the warehouse superintendent. It is fair to infer from the evidence that such recommendation would probably be followed. At one time two girls in Mr. Hawley's department were promoted, and while there is some minor difference in the version given by Mr. Mehne and that given by Mr. Hawley, it seems fair to conclude that the promotion was in part at least due to the recommendation of Mr. Hawley. While there are but few specific instances of the weight given to any recommendation which may have been made by Mr. Hawley with reference to the hiring, promotion, or change of status of any employee, the evidence does fairly indicate that Hawley's recommendation in this regard would be given particular weight. Mr. Hawley's immediate superior so testified, and no instance or circumstance appears in the testimony which would negate this statement. In fact, Mr. Hawley does not contend that his recommendation was not followed; he merely asserts that there have been no instances

where he made an adverse recommendation, and therefore it remains to be seen whether the employer would give particular weight thereto under such circumstances. But the fact that no dispute has arisen between Mr. Hawley and his employer as to the hiring or promotion of any employee, does not leave the issue in this controversy undetermined. All the evidence bearing on the issue indicates that, not only was Mr. Hawley consulted from time to time about the progress, permanent hiring, and the increase or decrease in the number of employees, but the additional fact appears that, whenever Mr. Hawley did make a recommendation, it was followed. Certainly, this is direct and convincing evidence that his recommendation was given particular weight as the Act now under consideration contemplates. One cannot speculate as to what might have happened if he had given an adverse recommendation as to the retention of any employee in his department. The Act does not require that, in order to be an executive, he must have the right to make the controlling recommendation as to the status of his employees. Moreover, it must be recognized that, in the performance of his daily duties in the shipping room, Hawley was in sole authority. No one knew more about the performance of these duties. To assume, therefore, that Hawley's recommendation would not be given weight with reference to the status of employees immediately under him would not only be contrary to the weight of the evidence, but contrary to the usual and normal way in which matters of this kind would be handled under the circumstances.

It is urged, however, that Hawley did not customarily and regularly exercise discretionary powers, as contemplated by Subsection (D) of the Regulations. It is suggested that his work was largely routine and that his determination of routing and whether the merchandise should be sent by parcel post or express, and his general supervision of the typists did not customarily and regularly require the exercise of any judgment. While the test of discretion as prescribed in the regulations may be entirely reasonable in determining whether one is an executive, it is obviously difficult in application. Presumably, every employee, whether executive or not, exercises some discretion in the performance of the duties assigned to him, and if it is true that Mr. Haw-

ley's work is so routinized that it merely runs like a well-oiled machine, it may well be that there is an absence of any discretion in the performance of his duties. On the other hand, it is uncontradicted that he does have full charge and supervision of some four employees. He lays out their work and coordinates the work of his department with the operation of a large wholesale house. While his employees, because of their experience, may go about their work without much direct supervision, it is fair to conclude that such efficiency is due to the training and teaching that he at some time has given to them. If incompetent or inexperienced typists are hired, it would be incumbent upon him to train them and then determine whether or not they have made sufficient progress so 'that he can in good faith recommend their retention. Certainly, it seems reasonable to find that he must exercise judgment and discretion when it is necessary for him to determine whether new help is needed, or which dray line should be called in order to furnish the best transportation for certain local hauls, and whether the typists do their work in a manner that he can approve. It appears from the evidence that sometimes the customer does not direct the routing that should be used in shipping the merchandise. There are many towns where two railroads or a railroad and a truck line may be utilized for the purpose of shipping freight. It is then Mr. Hawley's duty to exercise his discretion and judgment as to which particular transportation concern should be indicated on the bill of lading. Then, again, questions arise as to whether parcel post or express is the most convenient and economical for the consignee. Many executives are able to install a department and manage the same so that it runs along with but little interference from him from day to day. But when any problem does arise, it is the manager who determines the course to be pursued. When one stops to consider that the plaintiff company is a wholesale house that serves the entire Northwest and carries some 43,000 items in stock and has some 18 departments, it is quite improbable that the shipping room, through which all of the shipping orders flow, and where the bills of lading are made out, could be managed by anyone without the daily exercise of judgment and discretion. It is not without significance under the circumstances that Mr.

Hawley himself, when it appears that he must have known the full import of his words, characterized his work as that which required "constant and almost vigilant exercise of my discretion."

██ Walter Roginski is in charge of 14 men on the shipping floor and receives some $151.30 per month for performing these duties. He receives the bills of lading from Mr. Hawley, then sorts them out as to truck or railroad freight lines and hands them to one or more of his men to assemble and load the merchandise. He is then charged with the responsibility of calling the particular carrier to come and pick up the shipment. All of the work must be distributed by him among the 14 men on the shipping floor, and it is his sole responsibility to see that the merchandise is properly loaded into the trucks. Substantially all of Roginski's time is taken with the laying out of the work, directing, and supervising the men in his department. It is only under exceptional circumstances that he himself performs any of the same work which his men are doing. Obviously, under these circumstances, he must exercise discretion and judgment. The supervision of these men, the distribution of the work, and direction as to the performance of their duties, could not be efficiently performed without utilizing discretion and judgment.

In so far as Roginski's authority in hiring and firing employees is concerned, the evidence reflects a situation comparable to that which applies to Mr. Hawley. Roginski is consulted before men are placed on the permanent pay-roll. That his recommendations are accorded special weight is reasonably free from doubt. His immediate superior testified that Roginski's recommendations in the hiring and firing and promotion of men carried weight. Evidence was given of specific instances where his recommendation was followed as to the placing of certain employees under him on the permanent pay-roll. Roginski is in sole control of his department and no one of his superiors assumes to have any particular knowledge as to the fitness of the men or the problems which confront Mr. Roginski in the carrying out of the work which is assigned to him. It is entirely probable, therefore, that his judgment would carry weight as to the fitness of any employee. No department of this character could operate efficiently unless this were true.

There is no testimony that any employee was permanently hired or fired without Mr. Roginski's being consulted. In other words, there is no direct testimony by way of any denial that the employer is not presenting a true characterization of Mr. Roginski's status as shipping floor manager, when two of his superiors testified that his recommendation was and would be given particular weight as to the hiring and firing of any employee in his department. The specific instances which appear in the testimony tend to sustain the position of the plaintiff in this regard, and there are no facts or circumstances which negate plaintiff's contention.

██ In addition to the issue as to the status of Mr. Hawley and Mr. Roginski as executives in meeting the test under Subsections (C) and (D), Roginski takes the position that he is not a manager of a customarily recognized department or subdivision thereof. He contends that there is but a single shipping department and that Mr. Hawley is the head of such department. However, there is testimony that both of these departments are recognized as being separate by the company itself, and it is clear that, in the performance of his duties and in the supervision of 14 men under him, Roginski is in sole charge. He is in no way supervised or directed by Mr. Hawley. But not only is Mr. Roginski in full charge, but the undisputed testimony indicates that, in one department, the employees are exclusively engaged in the physical handling of merchandise and its preparation for shipment, while the other is engaged in making bills of lading and determining the routes and methods of shipment. Certainly, under these circumstances, there can be no substantial question but that these departments are separate; at least, the shipping floor where Mr. Roginski is in charge is a subdivision of a recognized department.

██ Attention is called to the fact that neither Roginski nor Hawley was ever asked to attend any executive meetings of the plaintiff company, although many have been held. But that fact or circumstance is not controlling. There is no evidence as to the nature of such meetings, the subjects discussed or the policies determined. Not all executives within the meaning of the Fair Labor Standards Act are the executives who may determine the policies of the company. The range of the exemption necessarily is broad. Nei-

ther is the fact that Hawley and Roginski were designated as "head shipping clerk" and "shipping room foreman", respectively, in the union contract controlling. The titles "head shipping clerk" and "shipping room foreman" are not inconsistent with the performance of executive duties, as that term is used in the Act and defined in the Regulations.

Defendants place emphasis on Fleming v. Hawkeye Pearl Button Co., 8 Cir., 1940, 113 F.2d 52, as authority for the view that the exemptions under the Act should be construed narrowly. This case so holds, and the Administrator entertains the view that the principles enunciated by the court in that case are equally applicable to the problems of definition and delimitation under Section 13(a) (1). Moreover, it seems quite apparent that the Administrator, in promulgating the rules and regulations governing executives, must have had that very theory of construction and interpretation in mind. Certainly, the rules thus promulgated tend to limit the term "executive" as used by Congress within a narrow if not arbitrary classification. Consequently, when any employee, by reason of his status, compensation, duties and responsibilities, comes within the test governing executives promulgated by the Administrator, it would seem that a reasonably narrow construction has been followed. The court knows of no reason why there should be any tendency or desire to avoid a fair application of the regulations to the factual situation, nor should there be any purpose on the part of the court to indulge in any unnecessarily strained or narrow approach to the problem. These employees are not receiving marginal or minimum compensation, and while there may be a rather close question as to the fulfillment of one or more of the tests, there should be no great difficulty in arriving at the view that the evidence, fairly considered, justifies the classification of these employees as executives. The views herein expressed are entirely consonant with the comments of those who have had the responsibility of framing suitable rules and regulations under the Act. Prior to the adoption of the regulations on October 24, 1940, which are now in force, it appears that extensive hearings were held by the Administrator by and through one of his executive officers, and thereafter recommendations by the presiding officer were published. There will be found in the report of the recommendations to Philip B. Fleming, who was then the Administrator, the following observation: "The present definition of the terms 'executive' and 'administrative' applies with particular aptness to persons who are commonly called 'bosses.' The range of exemption is broad. It extends from the president of a large and complex corporate structure down to the foreman in charge of a very minor department."

Attention may be called to the ruling of the Wage and Hour Division in an interpretation issued by the Assistant Solicitor in 4 Wage-Hour Reporter, No. 47, p. 637, where he states: "In our opinion the requirements of subsection (B) of Section 541.1 of the regulations are satisfied if an executive employee supervises one permanent employee and on fairly frequent occasions, as need arises, supervises additional temporary employees."

In so far as the range of exemption is concerned and the apparent intent of the Act to cover executives even though they may be at the lowest rung of the ladder, reference may be made to the recommendation of the presiding officer to the Administrator when he stated: "There was little detailed criticism of the phrase 'who customarily and regularly directs the work of other employees therein.' What criticism there was arose largely from a misunderstanding. Apparently there has been considerable doubt in the minds of employers, employees, and inspectors concerning the status of assistant department heads. In a large machine shop, for example, there may be a machine-shop supervisor and two assistant machine-shop supervisors. The question has been asked whether the two assistant supervisors qualify for the exemption. Assuming that they meet all the other qualifications of section 541.1 and particularly that they are not working foremen and do not perform the work performed by the men under their supervision, they should certainly qualify for the exemption."

In United States v. American Trucking Associations, Inc., et al., 310 U.S. 534, 549, 60 S.Ct. 1059, 84 L.Ed. 1345, the Supreme Court held that the interpretation of a statute by the men charged with its enforcement is entitled to great weight.

It is my opinion that the evidence fairly considered sustains the finding that both employees are executives within the mean-

ing of the Fair Labor Standards Act, and that plaintiff should have judgment accordingly. Findings of fact and conclusions of law in harmony herewith may be presented by the plaintiff upon five days' notice. In that the attorneys' fees incurred by the employees in defending this action are to be paid by the plaintiff, a showing as to the reasonable value of such fees and expenses—if not agreed to by the parties—may be made by defendants' counsel at the time that the proposed findings of fact and conclusions of law are presented. An exception is allowed to the defendants.